**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger**

Civil Action No. 08-cv-02750-MSK-KMT

**XTREME COIL DRILLING CORPORATION,**

> **Plaintiff,**

v.

**ENCANA OIL & GAS (USA), INC.,**

> **Defendant.**

---

**OPINION AND ORDER DENYING MOTION FOR JUDGMENT AS A MATTER
OF LAW OR FOR NEW TRIAL, GRANTING MOTION FOR ATTORNEY'S FEES,
AND DENYING MOTION FOR PREJUDGMENT INTEREST**

---

**THIS MATTER** comes before the Court pursuant to the Plaintiff's Motion for

Attorney's Fees (**# 238**), the Defendant's response (**# 253**), and the Plaintiff's reply (**# 256**); the

Plaintiff's Motion to Amend the Judgment (**# 240**) to include prejudgment interest, the

Defendant's response (**# 247**), and the Plaintiff's reply (**# 248**); the Defendant's Renewed Motion

for Judgment as a Matter of Law or, in the alternative, For a New Trial (**# 242**), the Plaintiff's

response (**# 246**), and the Defendant's reply (**# 249**); and the Defendant's Motion to Strike (**#57**)

an exhibit supporting the Plaintiff's reply in support of its attorney's fees motion, the Plaintiff's

response (**# 258**), and the Defendant's reply (**# 259**).

The Court will assume the reader's familiarity with the proceedings to date, offering only

a brief summary here and elaborating as necessary in its analysis.  Pursuant to a contract between

the parties, Plaintiff Xtreme Coil Drilling Corporation ("Xtreme") provided various oil and gas

drilling services to Defendant Encana Oil & Gas ("Encana") on two drilling rigs (Rig 6 and Rig 7).  On May 4, 2008, a catastrophic accident happened at Rig 6 when a "runaway condition" occurred in the drawworks (essentially, the rig's motor, mounted at the top of the rig) and the brakes were insufficient to prevent the drawworks from falling to the rig floor.  Both Rig 6 and Rig 7 were shut down for approximately three weeks, while Xtreme and its suppliers conducted an investigation into the matter.  At the conclusion of that investigation, Xtreme presented its findings and proposed fixes to Encana, and Encana agreed to continue to retain Xtreme's services.  Although the relationship was somewhat adversarial, Encana continued to enjoy Xtreme's performance under the contract until late October 2008, when it terminated both rigs.  It is undisputed that Encana refused to pay certain invoices submitted by Xtreme for services that Xtreme had provided to Encana between May and October 2008.  However, Encana contends that it was relieved of its contractual duty to pay the invoices because Xtreme's performance failed to comply with the contractual requirements.

In September 2012, the case proceeded to jury trial on two claims of breach of contract by Xtreme (one for each rig).  The jury returned a verdict in favor of Xtreme, awarding approximately $ 2 million on the claim involving Rig 6, and $ 500,000 on the claim involving Rig 7.

The parties have now filed various post-judgment motions.  Xtreme has moved for an award of attorney's fees (# 238) and for pre-judgment interest (# 240) under the terms of the contract.  Encana moves (# 242) for judgment as a matter of law on the merits, or, in the alternative, for a new trial, citing evidentiary deficiencies in Xtreme's case and errors made by the Court during the trial.

### A. Encana's motion

The Court turns first to Encana's motion.  It argues that the Court should reconsider (and, upon such reconsideration, grant) Encana's mid-trial motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 on the contract claim relating to Rig 6.  Encana contends that the evidence established that Xtreme materially breached the requirements of Paragraph 11 of the contract, which required it to provide equipment "of adequate size and capacity to perform [the drilling] work efficiently and safely."[1]  In addition, it argues in the alternative that the Court should grant a new trial pursuant to Fed. R. Civ. P. 59 because the Court erred in failing to give a jury instruction indicating that Encana was relived from performance of its contractual obligations if Xtreme materially breached the contract, even if Encana was not aware of such breaches at the time of its own non-performance.  Finally, it contends that the Court should grant a new trial because the Court erred in failing to give Encana's requested jury instructions on setoff and the affirmative defense of estoppel.

### 1. Rule 50 motion

Turning first to the Rule 50 motion, Fed. R. Civ. P. 50(a)(1) permits the Court to grant judgment as a matter of law if, after a party has been fully heard on an issue, "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue."  The Court may grant the motion only if the evidence points but one way and is susceptible to no reasonable

---

[1]     Encana states in its motion that there was evidence that also showed Xtreme breached other provisions of the contract, such as by failing to prevent drug use among the employees it provided (paragraph 8.4 of the contract) and its failure to follow good drilling practices (paragraph 8.7).  But Encana expressly limits its Rule 50 argument to the evidence relating solely to Xtreme's failure to provide appropriate drilling equipment.  *Docket* # 242 at 4 ("Encana's motion here is limited to the question of breaches of Paragraph 11").  Thus, the Court does not consider the other alleged breaches in considering Encana's Rule 50 motion.

inferences which may support the opposing party's position.  *Jones v. United Parcel Service,* 647 F.3d 1187, 1195 (10th Cir. 2012).   As with a motion for summary judgment, in evaluating a Rule 50 motion, the Court views the evidence in the light most favorable to the nonmovant – here, Xtreme.  *Id.*

Encana argues that the evidence demonstrated that Xtreme breached Paragraph 11's requirement that it provide equipment "of adequate size and capacity to perform [drilling] work efficiently and safely" in several respects: (i) it failed to install a kinetic energy management system on either rig, which contributed to the May 2008 accident on Rig 6 that caused the rig to shut down for several weeks; (ii) it allowed Rig 6 to function with defectively-designed brakes (also contributing to the accident); (iii) it initially provided a 600 horsepower motor on Rig 6, in violation of the contract's requirement for a 750 horsepower motor, and that the performance of Rig 6 suffered until Xtreme eventually installed a 1,000 horsepower motor instead; and (iv) the use of "new technology" on Rig 6 that caused "equipment-related issues" in drilling some of the earlier wells.

Before turning to the evidence introduced at trial, the Court pauses to address the legal standards governing breach of contract claims.  The elements of a claim for breach of contract are: (i) the existence of a binding agreement; (ii) the plaintiff's performance of its obligations (or some justification for its non-performance); (iii) the defendant's failure to perform its obligations; and (iv) resulting damages.  *Western Distributing Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992).  The requirement of "performance" means "substantial performance" – that is, that any deviations by the performing party from the contract's standards are "trifling particulars not materially detracting from the benefit the other party would derive from a literal

performance," such that the defendant "has received substantially the benefit he expected."  *Id.*
The plaintiff – Xtreme – bears the burden of proving "that he substantially performed his part of
the contract . . ."  *Id.*

Paragraph 11 of the parties' contract states "[Xtreme] represents that the equipment to be
used to accomplish the work under this Contract shall be of adequate size and capacity to
perform said work efficiently and safely."  Thus, the question presented is whether there is
competent evidence in the record indicating that the kinetic energy management system (or lack
thereof), brakes, and motor size of the equipment provided by Xtreme on Rig 6 were "of
adequate size and capacity to perform" the work of Rig 6 "efficiently and safely."[2]  The Court
finds sufficient evidence in the record to meet that standard.

Although the Court's review of the record does not reveal any testimony from a witness
contending, in express terms, that the equipment Xtreme supplied to Encana was indeed "of
adequate size and capacity to perform said work efficiently and safely," such an inference can
reasonably be drawn from the record as a whole.  Kyle Swingle, Xtreme's representative, was
asked whether "Xtreme substantially performed its obligations under these contracts," and
responded that "I believe we did everything that we were required to do in the contract."  He also
gave testimony that generally reflected Xtreme's belief that the equipment it provided for Rig 6
was adequate for the job.  Given that the Court must, on a Rule 50 motion, draw all reasonable
inferences in favor of Xtreme, the Court finds that the record permits a conclusion that Xtreme

---

[2] To put a very fine point on this issue, the pertinent language literally concerns *a representation*
of *what equipment would be used*, rather than what equipment was actually used.  However,
because the parties have understood and argued this issue as one of proof as to what was used,
the Court does so as well.

showed, albeit very generally and only via inference, that its equipment met Paragraph 11's requirement.

Turning to the question of whether there is evidence indicating that Xtreme materially breached its obligations under Paragraph 11, the Court finds that an extended recitation of the facts in the record is not necessary, as the matter can be resolved on a simpler level.  All four of Encana's arguments – that Xtreme breached Paragraph 11 due to the lack of a kinetic energy management system, insufficient brakes, an underpowered motor, and "equipment failures" on the first few wells – all relate to a state of affairs that occurred prior to the May 4, 2008 accident.  After completing its investigation of that accident, Xtreme made several changes to Rig 6, including installing a kinetic energy management system, better brakes, and a larger motor.  Xtreme presented its findings from the investigation and the nature of its repairs to Encana, and with Encana's consent, resumed drilling on Rig 6.  Testimony by Timothy Baer, a representative of Encana, is significant on this point.  Mr. Baer explained that after the May 2008 accident, Encana believed that it had the right to terminate the Rig 6 contract, but it chose not to do so because "we were optimistic – we could help make Xtreme work at a level that was acceptable to us."

When a party materially breaches the terms of a contract, the non-breaching party is presented with several options.  It may, of course, terminate or seek rescission of the contract; alternatively, it may elect to affirm the contract and continue both sides' performance obligations, seeking damages only for the past breach.  *Shotkoski v. Denver Investment Group, Inc.*, 134 P.3d 513, 515 (Colo. App. 2006); *Trimble v. City and County of Denver*, 645 P.2d 279, 281 (Colo. App. 1981), *rev'd in part*, 676 P.2d 716 (Colo. 1985).  Those options are mutually-

exclusive – a party may not, on the one hand, declare the contract terminated and relieve itself from its own future performance obligations and, on the other hand, elect to receive the breaching party's continued performance.  *Id.*; *VLN Corp. v. American Office Equipment Co.*, 536 P.2d 863, 866 (Colo. App. 1975).  If the non-breaching party chooses to continue to receive the performance by the breaching party, it is deemed to have affirmed the contract and is required to honor its own obligations.  *See e.g. Western Cities Broadcasting, Inc. v. Schueller*, 830 P.2d 1074, 1079-80 (Colo. App. 1991).

Here, even assuming that Xtreme materially breached the contract in the ways specified by Encana prior to May 2008, Encana's decision to affirm the contract and continue to accept Xtreme's performance required Encana to perform its own contractual obligation to pay for such services.  Encana essentially concedes that, even if Xtreme breached Paragraph 11 of the contract prior to May 2008 for the reasons stated above, Xtreme was no longer in breach of that paragraph for those reasons thereafter, as it had installed a kinetic energy management system, better brakes, and a 1,000 horsepower motor for the remainder of the contract's term.  Thus, it is essentially undisputed that, despite knowing of a potential breach of Paragraph 11 of the contract prior to May 2008, Encana nevertheless affirmed continued performance by Xtreme.  Any material breach by Xtreme of this contractual provision, then, is limited to the time period prior to May 2008.

The timing of Xtreme's alleged breach and Encana's affirmance of the contract is significant.  The parties stipulated that Xtreme's unpaid invoices for Rig 6 involved one invoice issued on May 29, 2008 (in the amount of approximately $230,000), various invoices issued between July and September 2008 (in varying amounts of a few hundred to several hundred

thousand dollars), and several invoices issued in October 2008 (totaling approximately $2.9 million, roughly $2.15 million of which was an early termination fee provided for by the contract). [3] Without belaboring the process by which the invoices are parsed, it is sufficient to observe that only one of these invoices – the May 29 invoice – charges for work performed prior to the May 2008 accident and subsequent cure by Xtreme of the breaches alleged by Encana here; all the remaining invoices reflect work performed by Xtreme after that time.[4] Thus, even assuming (without necessarily finding) that Encana is correct that it is entitled to judgment as a matter of law that Xtreme materially breached of Paragraph 11 prior to May 2008 (but not thereafter), that judgment would only have prevented the jury from considering the May 29 invoice.[5] The record reflects that Encana subsequently affirmed the contract and continued to enjoy Xtreme's substantial performance of its obligations, and thus, all the remaining invoices were properly submitted to the jury for consideration.

Accordingly, the Court denies Encana's renewed request for judgment as a matter of law under Rule 50.

---

[3]    The Court further notes that although Xtreme requested more than $3 million in unpaid Rig 6 invoices, the jury awarded only about $2 million as damages.

[4]    The "rate revision invoices," discussed in some detail below, may be a partial exception to this observation, but are not sufficient to alter the analysis herein.

[5]    Encana's motion seeks judgment under Rule 50 as to the entirety of Xtreme's claim regarding Rig 6. It has not addressed what remedy, if any, might be appropriate if the Court were to conclude that it was entitled to judgment only as to the May 29 invoice, or some part thereof, and in the absence of such clarity, the Court will not proceed to consider whether a partial Rule 50 judgment might have been appropriate. The Court notes that the jury's actual verdict is easily supported by the remaining invoices.

2. <u>New trial</u>

Alternatively, Encana seeks a new trial under Fed. R. Civ. P. 59(a), on the grounds that the Court erred in failing to give requested jury instructions.  Such a motion is directed to the sound discretion of the Court, and the Court will grant such relief only upon a showing that, due to substantial errors in the instructions given, the trial was not fair to Encana.  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940).  The Court considers the jury instructions as a whole, focusing not on whether there was any error in any particular instruction, but on whether, as a whole, the instructions failed to properly guide the jury in its deliberations.  *Haberman v. The Hartford Ins. Group*, 443 F.3d 1257, 1274 (10th Cir. 2006).

a. "after-acquired evidence"

Encana's first objection is to the Court's failure to give what Xtreme refers to as an "after-acquired evidence" instruction.  Addressing the element of breach, Instruction 9 given by the Court reads, in part, "If you find that Xtreme did not substantially perform its obligations under the parties' contracts, then Encana had no further duty to perform its obligations under the contract."  At the charging conference, Encana requested that the Court modify that instruction, appending the phrase "even if Encana was not aware at the time that Xtreme had failed to substantially perform" to the end of the instruction.  Encana states that it "only learned about the full extent of Xtreme's prior breaches of the parties' contracts through discovery in this litigation."

This argument relates to an issue involving Paragraph 8.4 of the contract.  That provision obligated Xtreme to "use its best efforts to maintain a drug free environment." The record reflects that although Xtreme performed pre-employment drug testing, it occasionally allowed

employees to work while their samples were undergoing testing (contrary to a policy known as "DISA"), and on several occasions, Xtreme terminated employees who had been working for several days when their drug tests came back positive. The record reflects that Encana was contemporaneously aware of at least some instances of this: Mr. Baer, Encana's representative, testified about the time frame of early June 2008, stating that, at that time, "We're still seeing high turnover. They're still the poorest performing rig in my group. The training was not solved. Their hiring practices were still not solved. **We're still seeing drug tests positive**. And so no, this was not solved." (Emphasis added.) Notwithstanding these various problems, Mr. Baer testified that, as of that time, "we [were] . . . still willing to work with Xtreme[,] we wanted to continue working with this relationship." Mr. Baer also testified about another meeting with Mr. Swingle in or about October 2008, in which mention was made that "an experienced driller was released that day because of a prior drug offense."

At the Charging Conference, Encana requested that the Court instruct the jury that a material breach of the contract by Xtreme could operate to excuse Encana's own performance, even if Encana was not previously aware of that breach. In arguing for such an instruction, Encana pointed to Xtreme's alleged breach of Paragraph 8.4, stating

> there was evidence presented at trial that Encana did not learn of the drug incidents until discovery in this case. And there was specific testimony about Mr. Chad King who, in violation of the DISA policy that was in effect on Rig 6, took a preemployment drug test, went out to the rig site, and worked for five days. At that point, it was determined or discovered that he failed his drug test. The fact that he was allowed onto the property by Xtreme without having his negative drug test results first is a violation of DISA. That information was not brought to Encana's attention until this litigation.

10

Under 8.4, Encana has an immediate right to terminate the contract if there is a violation of that provision.  So this is important evidence that demonstrates that Xtreme materially breached the contract.  And that even though Encana didn't learn of that until later, under Colorado law, that can still be a reason for showing that Xtreme failed to perform its second element under breach of contract claim.

The Court declined to give the additional portion of the instruction requested by Encana. It explained that it "make[s] no particular finding as to whether that portion of the instruction is a correct statement of the law, but I direct that if Xtreme intends to argue that Encana may not rely upon breaches that it discovered after the releasing of Rig 6 and Rig 7, that it give notice of its intent to do so and be prepared to address the legal effect of whether such *post hoc* notice bars the argument."  Xtreme's counsel responded that "I have no intention of going there."  However, in its closing argument,  counsel referred to letters written by Encana to Xtreme between June and October 2008, in which Encana informed Xtreme about potential breaches of the contract, Xtreme stated:

Besides Section 8.7, [Encana] complains about violations of three other sections.  They complain we violated 8.4.  Let's look at that. Let's start with the letters [Xtreme] received, the three letters, Exhibits 27, 43, and 60.  Look at those letters.  And according to Mr. Baer's testimony yesterday, they were all written with the assistance of legal counsel.  Yet, there is not one citation to any of these three sections in those letters.

Once again, I use the term Monday morning quarterbacking, because that's exactly what this is.  Certainly, if Mr. Baer and Mr. Fox, along with their legal counsel, meant to claim that Xtreme was in breach of section 8.4 . . ., they knew how to write letters. We've seen that. . . .

Encana now argues that this argument ran afoul of the Court's directive to Xtreme not to raise the issue of after-acquired evidence without first giving notice,[6] and demonstrates why the Court's refusal to give a full after-acquired evidence instruction to the jury was error.

The Court rejects the first contention – that Xtreme's argument violated the Court's directive that Xtreme give notice before arguing that Encana could not rely on after-acquired evidence of violations of Paragraph 8.4 -- as the Court does not interpret Xtreme's argument to address any after-acquired evidence. As noted above, the record indicated that at various points between June and October 2008, Mr. Baer was **contemporaneously** aware of Xtreme employees failing drug tests, yet Encana's letters to Xtreme in this time frame never made mention of these incidents or its belief that Xtreme might be in breach of Paragraph 8.4. Because Encana knew of some positive drug tests by Xtreme employees during this time period, but never raised any concerns about them in writing, it was proper for Xtreme to argue in its closing that Encana was now appearing opportunistic, claiming at trial that the positive drug tests constitute a material breach of the agreement when, at the time, Encana manifested little concern about the positive tests of which it knew.

That leaves the question of whether the Court erred in failing to advise the jury that a material breach by Xtreme could relieve Encana of its performance obligations, even if Encana was not aware of that breach at the time it refused to perform. It is a generally-accepted principle of contract law that "one party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties . . . even though that other

---

[6]     Encana did not lodge any contemporaneous objection to Xtreme's closing, and thus, the Court considers only whether it was "plain error" for the Court to permit that closing argument to stand even in the absence of any objection. *See e.g. U.S. v. Taylor*, 193 Fed.Appx. 793, 795 (10th Cir. 2006) (unpublished).

party does not know of the failure." *Restatement (Second) of Contracts*, § 237, comment c.  In general terms, Colorado tends to follow the broad principles of contract law set out in the Restatement.  *See e.g. Colorado Interstate Gas Co. v. Chemco, Inc.*, 854 P.2d 1232, 1239 (Colo. 1993) (citing, with approval, other principles expressed in section 237 of the Restatement). Thus, the Court will assume, without necessarily finding, that Colorado law adopts the after-acquired evidence principle, at least in the abstract.[7]

The Court begins by noting that, although the Court did not instruct the jury that it could consider evidence of material breaches by Xtreme that Encana did not discover until after it had terminated the contract and refused to pay the outstanding invoices, neither did the Court instruct the jury that it was **prohibited** from considering such evidence.  The jury was merely instructed that a material breach by Xtreme could excuse Encana's performance.  Encana was free to argue that any breach by Xtreme, at any point in time, could excuse its own obligations.  Indeed, Encana's closing argument expressly addressed, without objection, alleged breaches by Xtreme and Encana's after-the-fact discovery of those breaches:

> Now, 8.4 is the drug policy . . . and 8.4 doesn't have this notice period stuff [for terminating the contract].  8.4 is you [that is, Xtreme] did this, you're gone.
>
> . . . Now, Mr. Fox testified that Encana didn't learn about the fact that the driller who was at the stick on May 4 tested positive for marijuana on May 4 until that – after this lawsuit was filed. During the period of the contract, they didn't tell us that very important fact. . . . .
>
> I mean, so Encana didn't know it, because they didn't tell us.  But we know now, we had the right at any time under 8.4 to

---

[7]    The principle is expressed in Colorado's Pattern Jury Instructions, but Encana has not cited, and this Court's research has not revealed, any cases in which that principle is actually applied.

> immediately terminate these guys for cause.  You know, not a
> surprise that we weren't informed of our right to let them go
> immediate.  Not a surprise that we had to wait and suffer through
> four years before we got a chance to tell that story.

Given that the jury was properly charged with determining whether any material breach by

Xtreme occurred, were not given any instruction that directly or indirectly limited the jury's

ability to consider breaches discovered after-the-fact by Encana, and Encana argued to the jury

that it should consider alleged breaches that were not contemporaneously known, the Court

cannot say that the failure to include Encana's proposed instruction warrants a new trial.  *See e.g.*

*Abbasid, Inc. v. First Nat. Bank of Santa Fe*, 666 F.3d 691, 696 (10th Cir. 2012) ("a trial court

need not clutter the jury instructions with every potentially relevant correct statement [and]

where the other instructions establish a sound basis for an argument by the party to the jury on

the proposition, an additional instruction is not essential").

Moreover, even if it was error for the Court not to give Encana's requested instruction,

the Court has some doubt that Encana has shown that such error was prejudicial.  A new trial

based on error in instructing the jury is warranted only where that error resulted in some

prejudice.  *Smith v. Diffee Ford-Lincoln-Mercury, Inc.*, 298 F.3d 955, 962 (10th Cir. 2002).

Here, the preceding discussion establishes that as of June 2008, Encana was aware of several

instances of Xtreme employees testing positive for drugs, yet Encana either considered those

tests to be non-material breaches of the parties' contract, or Encana chose to excuse such

breaches and continue to employ Xtreme's services.  Encana's argument at trial seemed to be

that although it ignored or forgave positive drug tests that it was aware of at the time, the jury

should find that other positive drug tests -- of which Encana was **unaware** -- to constitute

material breaches of the contract such that, had Encana known of them, it would have invoked its

right to terminate the contract under Paragraph 8.4.  No representative of Encana testified that, notwithstanding its forgiveness of other positive drug tests, it would have invoked its right to terminate the contract upon discovering a particular employee's (*e.g.* Mr. King) positive drug test.  Indeed, the record reflects that Encana chose to overlook a large number of events occurring in and about June 2008 – general performance problems, the May 4 accident and its alleged causes discussed above, numerous positive drug tests -- that it now contends were material breaches of the contract.  Thus, it is difficult to imagine that Encana's contemporaneous knowledge of Mr. King's positive test or an unidentified quantity of positive tests by other unnamed employees would be the proverbial straw that broke the camel's back, causing Encana to abruptly terminate a contract that, the evidence establishes, it was eager to continue.  Under these circumstances, the Court cannot conclude that if the jury had been given the instruction proffered by Encana, the result of the trial would be different.  Thus, any error by the Court in failing to given Encana's tendered instruction was harmless and does not warrant a new trial.

b. "setoff"

Encana objects to the Court's refusal to give Encana's Tendered Instructions 1-3, which address the issue of "setoff."  In actuality, "setoff" is the name given to a process; what Encana actually sought an instruction to the jury on was a counterclaim for breach of contract against Xtreme.[8]  As articulated in the Charging Conference, Encana's breach of contract counterclaim arose from the Rig 6 accident in May 2008.  Both Rig 6 and Rig 7 were shut down for a three-week period of investigation and remediation following the accident for in.  As noted above, Encana contended that Xtreme's use of inadequate equipment on Rig 6 constituted a breach of

---

[8]      Although Encana only pled "setoff" as an affirmative defense, the Court treated it as a counterclaim.

15

Xtreme's obligations under Paragraph 11 of the contract, entitling Encana to an award of damages for that breach.  Encana contended that it was injured by this breach because it had to pay for "equipment leasing costs incurred during time periods that the equipment was forced to sit idle due to Xtreme's various equipment and performance failures."

The evidence at trial on this issue consisted of Exhibits 222, 223, and 224, each of which are lengthy spreadsheets, entitled "Daily Cost Sheet," that have certain line items highlighted. Mr. Baer testified about these exhibits, stating that during the time that Rig 6 was not functioning after the May 2008 accident, "I'm still paying for rentals, I'm still paying for supervision.  I have downhole tools in one of my wells that is paying quite a bit of a day rate, as that is a rental item, and no progress.  Also, six total weeks of drilling, I'm losing two, three, four wells that are not drilled in that calendar year.  That, again, is loss of productivity and loss of value to Encana." Mr. Baer estimated that those costs amounted to approximately $ 500,000.  He was then shown Exhibits 222, 223, and 224, which he responded affirmatively to counsel's question of whether "the highlighted costs here . . . is this part of the daily cost sheets that comprise the $ 500,000 in Encana costs that you just mentioned."  Mr. Baer testified that, after receiving invoices from Xtreme in mid-July 2008, charging Encana approximately $ 530,000, he spoke to Mr. Swingle about the costs that Encana had incurred during May 2008, which Mr. Baer considered to be "almost a one-for-one direct offset."  Mr. Baer testified that he asked Mr. Swingle "what do I need to do with these invoices?," and that Mr. Swingle told him to "hold those and not pay those

at this time."  The record is somewhat unclear on this point, but it appears that Encana never paid the invoices in question.[9]

After a lengthy colloquy on the issue during the Charging Conference, the Court ultimately decided not to give any of Encana's tendered "setoff" instructions.  The Court primarily articulated two reasons: (i) that Encana's claimed injuries were in the nature of consequential, not direct, losses occasioned by Xtreme's alleged breach, and Paragraph 14.12 of the contract expressly prohibited either party from recovering consequential damages; and (ii) that "there [are] only conclusory statements made by Mr. Baer" supporting the itemization of the costs and that the exhibits "[do] not tie to a particular breach of the contract."

In the instant motion, Encana addresses only the Court's finding that the damages claimed by Encana in its counterclaim were "consequential" damages rather than direct damages. The Court has extensively considered the issue, including the authority cited by Encana, and

---

[9]     Mr. Baer never specifically identified the invoices themselves, and his testimony generally gives the impression that Encana followed Mr. Swingle's instruction to not pay them. The only evidence in the record that could be understood to suggest that Encana **did** pay the invoices in question is a question by Encana's counsel to Mr. Baer, "You're talking about $500,000 in costs that Encana paid during this down period, correct?," to which Mr. Baer responded "yes."  However, an understanding of the context of this question and answer strongly suggests that the "$ 500,000 in costs" that Encana "paid" is a reference to payments made by Encana to third parties to lease the equipment that was left idle, not payments made by Encana to Xtreme on the invoices.

Mr. Swingle's testimony expressly indicates that at least one of the invoices at issue in this case – a July 14, 2008 invoice for Rig 7 in the amount of approximately $ 303,000 (Exhibit 99) that the parties stipulated was never paid by Encana – was one that he discussed with Mr. Baer in October.  Mr. Swingle stated that "they were going to hold this invoice and another as an offset to the expenses they incurred while we were doing our repairs during the May drawworks top drive incident."  Mr. Swingle states that he responded that "you really should pay this invoice, both of these invoices," suggesting that there was at least one other unpaid invoice, besides the July 14 Rig 7 invoice, against which Encana was seeking an offset.

acknowledges that the question of whether Encana's leasing costs for idled equipment constitutes "direct" (or "general") or "consequential" damages is not a clear-cut one.[10]

Even if the Court erred in construing Encana's lease costs as consequential rather than direct damages under Paragraph 14.12, Encana's counterclaim should not have been submitted to the jury for several reasons. First, Encana failed to put on sufficient evidence that the losses it incurred were caused by Xtreme's breach. The entirety of Encana's proof as to the particular injuries suffered and their causation is Mr. Baer's statement that "I'm still paying for rentals, I'm still paying for supervision. I have downhole tools in one of my wells that is paying quite a bit of a day rate, as that is a rental item, and no progress. Also, six total weeks of drilling, I'm losing two, three, four wells that are not drilled in that calendar year. That, again, is loss of productivity and loss of value to Encana." Assuming, without necessarily finding, that Encana is correct and cases like *Tull* stand for the proposition that the costs of rental equipment or materials obtained by Encana in conjunction with the contract can constitute recoverable losses, such costs are only recoverable where they are "unavoidable" – that is, where the equipment or

---

[10]    Both at trial and it its motion, Encana placed primary reliance on *Tull v. Gunderson's, Inc.*, 709 P.2d 940, 945 (Colo. 1984). The Court finds *Tull* inapposite. Although it states in passing that "equipment leasing costs may be considered direct costs of completing a contract," this Court does not understand *Tull* to be stating that, in terms of measuring contract damages, equipment leasing costs are "direct" losses, rather than "consequential" ones. The distinction between direct and consequential damages was not a question addressed by the Court in *Tull*. Indeed, the major issue addressed in *Tull* is the proper calculation of a party's **lost profits** as damages. Numerous Colorado courts have categorically stated that lost profits "are consequential damages." *Prospero Associates v. Redactron Corp.*, 682 P.2d 1193, 1198 (Colo.App. 1983); *Ludlow v. Gibbons*, ___ P.3d ___, 2011 WL 5436481 (Colo.App. Nov. 10, 2011), *rev'd on other grounds*, ___ P.3d ___, 2013 WL 3342676 (Colo. Jul. 1, 2013). Indeed, even the Court of Appeals in *Tull* expressly characterized the costs relating to the equipment leases as "consequential damages." *Gundersons, Inc. v. Tull*, 678 P.2d 1061, 1064 (Colo.App. 1983). It is not clear whether the Supreme Court's reference to "direct costs of completing a contract" was intended to correct the Court of Appeals' label, or whether it refers to something else.

18

materials cannot be put to productive use by Encana in some other capacity.  *See e.g. Tull*, 709

P.2d at 945-46.  Mr. Baer's testimony did not establish that Encana was unable to avoid the

waste of some of the rental items by, say, repurposing them to other jobs or surrendering them to

the rental company.

Indeed, the lack of specificity in Mr. Baer's testimony was highlighted by the following

exchange between the Court and Encana's counsel during the Charging Conference:

> MR. LOPACH:  . . . these were costs that – they're paying for
> things that are not being used.  They're not being used because
> operations have been suspended because of this incident and the
> subsequent investigation.
>
> So because the rig isn't running during that time period, Encana, it
> can't do anything – Xtreme can't drill, but Encana continues to pay
> on a daily basis, for example, the company man, and for other
> equipment that is kind of sitting idle that's not being used because
> the rig isn't running.
>
> THE COURT: Okay.  Well, then, let's look at Exhibit 222.  Let's
> look at "power, fuel, an entry of $ 13,565.  What in the record says
> what power, fuel was for?  And if the rig was shut down, why was
> there any cost for power and fuel?
>
> MR. LOPACH:  I would imagine, because while the investigation
> was going on, maybe to run a mud pump.  Again, I don't think Mr.
> Baer went into that detail.
>
> THE COURT: So there is nothing in the record that tells me what
> that is.
>
> MR. LOPACH: Well, I think he described there as – well, again,
> these are necessary business costs.  To the extent that – if he's
> providing electricity or power, they weren't drilling.  They weren't
> doing normal drilling operations.  What they were doing is
> investigating.  Now, while that investigating is going on, I'm
> assuming that there was – they were in the middle of a well.  I
> think there is testimony to that effect, they were in the middle of a
> well.  You still have to had mud, power, people coming out, PREP,

> Mayco, everyone is doing their investigation.  So I think these are certainly costs that were being incurred.

Notably, Encana's counsel's argument is more factually-detailed than Mr. Baer's testimony – linking the cost of fuel to a running mud pump, linking the cost of providing power to the need to accommodate the investigation into the well – but argument is not evidence and the sufficiency of Encana's counterclaim must be tested against only Mr. Baer's testimony.  His testimony was simply insufficient.  Mr. Baer testified that he concluded that some $ 500,000 in Encana's costs were attributable to Xtreme's alleged breach, but Mr. Baer does not describe how he selected the particular components of that sum, does not elaborate on how he concluded that those injuries  were caused by Xtreme's breach,[11] and does not establish that each of the items reflect costs that Encana could not have avoided by repurposing or returning the leased equipment or materials.

Mr. Baer's lack of specificity is especially troubling, given that he immediately follows his identification of the $ 500,000 in damages with the statement "I'm losing two, three, four wells that are not drilled in that calendar year.  That, again, is loss of productivity and loss of value to Encana."  If Encana is correct that equipment rental costs constitute direct damages for a breach under Colorado law, Paragraph 14.12 of the parties' contract expressly states that injuries such as "loss of profit or business interruptions including loss or delay of production, however that may be caused" constitutes consequential damages that are not recoverable.  Given the lack of specificity in Mr. Baer's testimony, the Court cannot say which components of the $ 500,000

---

[11]     By means of example, there are several entries in Exhibit 222 alone under the category "Contract Labor" with the description "Suck water off ground" or "Suck water around rig."  It is difficult to conceive of how Encana's need to remove water from the ground or from around the rig can be caused by Xtreme's alleged breach of the contract.

in requested damages might reflect Encana's "lost of productivity and loss of value," rather than being "unavoidable" costs that Encana incurred because of the rig shutdown.

Because the Court finds that Encana's proof failed to sufficiently support its obligation to demonstrate that Xtreme's alleged breach was the cause of the damages that Encana was claiming in its counterclaim, any error in the designation of such damages as consequential rather than direct was harmless.

Any such error is harmless for a second reason. As noted above, a party asserting a breach of contract claim must show: (i) its own performance under the contract or excuse therefor; (ii) the other party's material breach of the contract; and (iii) damages caused by the other party's breach. *Diodosio*, 841 P.2d at 1058. The record does not reflect that Encana performed its own obligations under the contract by paying Xtreme's invoices for the time period at issue. The Court assumes that Encana's position on this issue is that it was not required to render its own performance because of Xtreme's prior material breach **and** that Xtreme's breach further entitled Encana to recover its own damages in addition. (In other words, not only does Encana not owe Xtreme for the amount of the unpaid invoices covering the May 2008 time period, but Xtreme also owes Encana some $500,000 for Encana's own expenses.) This creates an interesting paradox: on Xtreme's own claims for breach of contract, the jury was instructed that proof of any material breach by Xtreme required a verdict for Encana. By finding a verdict for Xtreme (on an issue for which Xtreme had the burden of proof), the jury necessarily rejected any ostensible breach of contract counterclaim by Encana, as a material breach by Xtreme was also a necessary element of that counterclaim. Thus, any error by the Court in failing to give Encana's proposed "setoff" instructions was harmless.

21

c. estoppel

Finally, Encana objects to the Court's refusal to give Encana's tendered instructions on the affirmative defense of estoppel.

Even post-trial, the precise contours of this issue still remain somewhat elusive. Paragraph 4.9 of the contract provides that "the rates . . . due to [Xtreme] shall be revised to reflect the change in costs if the costs of [various items including labor, fuel, etc.] vary by more than __[actual]___ percent from the costs thereof on the date of this contract." On October 31, 2008, Xtreme sent Encana four invoices (Exhibits 110-113), each in the sum of approximately $ 300,000 - $ 400,000, reading "revision in rates in accordance with contract section 4.9." The revised rates apparently increased the prices that Xtreme was charging for labor costs and parts/supplies costs, for both Rig 6 and Rig 7, and purported to revise the rates charged by Xtreme for these items on a monthly basis retroactive to May 2007 and running to September 2008.

There was relatively little trial testimony about these rate revisions, and none of it was particularly elucidating. Mr. Wood, Xtreme's CEO, was asked what Paragraph 4.9 of the contract allowed Xtreme to do. He responded "well, on an annual basis, it's just like – since this was a multi-year contract, you have different things that can escalate on you during the time of the contract that aren't contemplated when you first sing the contract." He explained that labor and parts costs had increased over the term of the contract, "so that would have been – this allowed us to move forward to increase the price of personnel." Mr. Wood was not asked, and thus did not explain, the genesis of his understanding as to how the language of Paragraph 4.9 permitted changes "on an annual basis" (much less retroactively), did not explain his

understanding of the contract's term "actual percent,"[12] did not elaborate on any mechanism by which Xtreme ascertained the rates of increases in its costs, and offered no insight into any discussions between the parties reflecting their mutual understandings of Paragraph 4.9 at the time the contract was signed.  Similarly, Mr. Swingle simply testified that "we billed all of the revision in rates we were entitled to," and did it at that point in time because "there [is nothing] in the contract . . . that limits the time period you can bill for these rate revisions."

Encana's witnesses added only a bit more clarity.  Mr. Baer testified that he never had any discussions with Xtreme about any potential rate increases prior to receiving the October 2008 invoices, and that he "totally disagreed with them" when he received them.  He stated that he believed that Section 5.1 of the contract required that "incurred costs should be billed on the month that they are incurred, meaning, that these should be prospective charges.  We cannot by contract go retroactive, in this case, over a year, and find costs that were increased during that time."  Beyond Mr. Baer's stated belief that pursuant to Paragraph 5.1,"we cannot by contract go retroactive," he does not elaborate on the basis for Encana's belief that the rate revisions were improper, nor does he offer any insight as to the parties' understanding of Section 4.9 at the time of contracting.

At the Charging Conference, Encana tendered a proposed jury instruction reflecting the affirmative defense of estoppel, i.e. that "Xtreme, by remaining silent about any increase in costs, notwithstanding that it had a duty to revise its rates when it submitted monthly invoices to

---

[12]     One might normally assume that this provision merely allows Xtreme to bill its actual labor and supplies costs, rather than any rates set forth in the contract.  However, the revisions to the supplies rates, in particular, do not recite any "actual" costs incurred by Xtreme.  Rather, they appear to apply some unclear formula apparently derived from the "December 2005 Producer Price Index" for oil and gas operations, as reported by the U.S. Bureau of Labor Statistics.

Encana, thereby represented . . . that Xtreme was waiving [its] ability to charge revised rates," upon which Encana relied to its detriment.  The Court inquired of Encana's counsel as to "the evidence that Encana relied upon the silence of Xtreme as to a rate change," and Encana's counsel responded "It affected Encana's drilling program."  He elaborated that "had Encana known that rates were going up, given the other circumstances, I believe, according to Mr. Baer's testimony, . . . those decisions could have been made differently."  But Encana did not point to any specific testimony by Mr. Baer or any other person that indicated an express reliance on Xtreme's alleged waiver of its right to revise invoices, and, as the discussion above indicates, no such testimony is found in the record.

Because estoppel is an affirmative defense, it is axiomatic that Encana bears the burden of showing that it came forward with sufficient evidence to establish all the elements of its defense.   Its own instruction makes clear that, assuming Xtreme did indeed "represent . . . that [it] was waiving" its rights to charge revised rates (a proposition the Court finds dubious), Encana was required to show that it "relied on Xtreme's silence concerning any increase in costs" and "materially changed its position" upon that reliance.

Because there was no testimony whatsoever from Encana's witnesses that Encana took any action in reliance upon Xtreme's alleged "waiver" of its right to revise its rates, the Court properly refused to give the tendered estoppel instruction.  Counsel's supposition that Encana "could have made [decisions] differently" is itself nothing more than hypothetical "reliance," and even that is far more specific that the evidence in the record, which reveals no alleged belief by Encana that Xtreme had chosen to waive its rights to revise rates by not doing so promptly, nor any clear indication that Encana was taking any particular action in reliance upon such a belief.

24

The record merely reflects that Mr. Baer was surprised by the October 2008 invoices; it does not indicate that Mr. Baer had previously recognized Xtreme's right to revise rates, noted Xtreme's failure to do so, deemed that failure to be a representation that Xtreme was "waiving" its right to do so, and took action in reliance upon that waiver. Accordingly, Encana's motion for judgment as a matter of law or a new trial is denied.

### B. Xtreme's motions

Xtreme makes two motions, one seeking an award of attorney's fees (**# 238**) in accordance with the contract's terms, and one seeking prejudgment interest (**# 240**).

#### 1. Attorney's fees

Paragraph 21 of the parties' contract provides that "if suit is brought [on this contract for collection of any sums due hereunder], then the prevailing party shall be entitled to recover reasonable attorney's fees and costs." Xtreme seeks a total award of $ 717,240.95 in fees and costs in incurred in presenting its claims against Encana.

Encana concedes that, if its post-judgment motion is denied, Xtreme is the "prevailing party" in this action and entitled to a fee award. However, it contends that the amount of hours claimed by Xtreme are unreasonable and its requested hourly rates are excessive, and that a fee award of no more than approximately $ 325,000 should be made. Encana also contends that Xtreme's request for costs is duplicative of its Bill of Costs and is not properly supported.

The contract's terms permit Xtreme to recover "reasonable attorney's fees." That phrase appears in various statutes and is the subject of a well-established body of case law. In the absence of any evidence indicating that the parties intended some different interpretation of the phrase to apply, this Court will apply the familiar "lodestar" analysis: first, the Court calculates a

25

"lodestar" figure by multiplying a reasonable hourly rate by the number of hours reasonably incurred by Xtreme's counsel. *See generally Gisbrecht v. Barnhart*, 535 U.S. 789, 801-02 (2002) ("the 'lodestar' figure has, as its name suggests, become the guiding light of our fee-shifting jurisprudence"); *Hensley v. Eckerhart*, 461 U.S. 424 (1983). Second, the Court addresses whether that lodestar figure should be adjusted upwards or downwards based on the particular circumstances of the case, although adjustments to the lodestar figure are made only in unusual situations. *Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 564-65 (1986). The goal of the exercise is to produce "an award that **roughly** approximates the fee that the prevailing attorney would have received if he or she had been representing a paying client who was billed by the hour in a comparable case." *Perdue v. Kenny A ex rel. Winn*, 130 S.Ct. 1662, 1672 (2010). The applicant seeking fees bears the burden of demonstrating that the hours expended and rates charged are reasonable. *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir. 1986).

> a. <u>hourly rate</u>

Turning first to the question of reasonable hourly rates, the appropriate rate to be applied is "the prevailing market rates in the relevant community," that is, "in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation. *Missouri v. Jenkins*, 491 U.S. 274, 286 (1989).

Xtreme seeks fees for three partners at the following rates (averaged over the 2010-2012 period): three partners, Mr. Quiat, $528; Mr. Kristiansen, $ 448; and Mr. Curtis, $ 350; one associate, Mr. Schacht, $262; and one paralegal, Ms. Bliss, $ 210. As support for this request, Xtreme initially offered only the affidavit of Mr. Quiat, which states simply that these "are

comparable to the rates charged by other attorneys and paralegals in Denver with similar experience and skills."  Encana responded an affidavit by Gary Davenport, a practicing attorney, who opines that "in the Denver legal community, the hourly rates for experienced partners [*i.e.* Mr. Quiat] in a case such as this would range between $ 300 and $ 350 an hour."  Mr. Davenport also opines that a reasonable hourly rate for Mr. Schact's time "is $200," but he does not indicate whether this is simply his own valuation or a statement as to the hourly rate typical in the Denver community for an attorney of Mr. Schact's experience.  He further states that the rates requested for Ms. Bliss are "substantially more than those that oil and gas companies permit to be charged for paralegals," suggesting that a rate of $75 an hour is appropriate.

In its reply brief, Xtreme submitted the affidavit of David Stark, another practicing attorney.[13]  Mr. Stark responded in some detail to the various conclusions reached by Mr. Davenport on various matters.  As to rates, Mr. Stark states that the rates requested by Xtreme "are more than reasonable for oil and gas litigation performed by a national firm in the Denver metropolitan area," that they are consistent with "several surveys of hourly rates for national firms" (although he neither provides the text of or citation to such surveys), and that Encana's counsel requested similar rates in a recent fee application in *Ohio Spine Network, Inc. v. Lanx, Inc.*, D.C. Colo. Case No. 10-cv-2402-CMA-MJW.

The Court is not persuaded by any of the affidavits supplied by the parties, as they are all largely conclusory.  Each recites the affiant's opinion that the rates he advocates for are typical in the community, but none of them provide any specific factual support for those opinions.  As

---

[13]     Encana has moved (**# 257**) to "strike" Mr. Stark's affidavit, arguing that it was improperly presented in a reply brief, rather than as part of Xtreme's initial moving papers. Because the Court declines to give significant weight to the largely conclusory affidavits of both sides, it denies Encana's motion as moot.

an inherently quantifiable matter, one would hope for a basis for the espoused opinion such as evidence of specific rates actually charged by various law firms in the community. Mr. Stark's affidavit comes closest to this because it refers to a survey of typical rates, but unfortunately he offers only his secondhand analysis of the survey's results, rather the survey results that the Court can assess and evaluate. Under these circumstances, the Court gives little weight to either side's arguments as to the appropriate hourly rate.

Instead, the Court resolves this dispute by examining other sources of evidence as to reasonable rates in the Denver area. First, the Court turns to recent reported decisions from this District that address contested hourly rates. In *Center for Biological Diversity v. U.S. Fish and Wildlife Serv.*, 703 F.Supp.2d 1243, 1249-50 (D. Colo. 2010), a case focusing on environmental issues, Judge Daniel found an hourly rate of $ 400 appropriate for "an experienced environmental litigator with over 17 years of experience." In *Casey v. Williams Production RMT Co.*, 599 F.Supp.2d 1253, 1256 (D. Colo. 2009), Judge Arguello found, "based on the Court's own knowledge," a claim of a $400 hourly rate for a "experienced personal injury litigators in the Denver market" is "unreasonably steep," and the prevailing hourly rate is "more like $ 350 per hour." These cases suggest that the prevailing rates in Denver for experienced litigators approach $400 per hour in recent years.

This Court also considers its own recent unreported rulings on fee requests, most notably *Universal Drilling Co. v. Newpark Drilling Fluids*, *LLC*, D.C. Colo. Case No. 08-cv-2686-MSK-CBS, *Docket #* 48 (Feb. 22, 2011). There, the Court noted the contents of a 2008 survey by the Colorado Bar Association that found that, as to partners in large firms, the median billing rate was $ 400 per hour; with a rate of $ 541 constituting the 95th percentile of reported rates.

28

Based on these cases (adjusted generously for inflation) and the Court's own familiarity with the range of prevailing rates in the Denver market, *see generally Guides, Ltd. v. Yarmouth Group Property Mgmt., Inc.*, 295 F.3d 1065, 1079 (10th Cir. 2002) ("where a district court does not have before it adequate evidence of prevailing market rates, the court may use other factors, including its own knowledge, to establish that rate"), the Court finds that a reasonable hourly rate for lead counsel in a case such as this (which requires some experience in commercial litigation but little specialized knowledge) is no more than $ 450 per hour.[14]  The Court will reduce Mr. Quait's hourly rate to that amount.  The Court further concludes that Mr. Schact's requested rate of $ 262 is consistent with various reported and unreported decisions and the Court's own knowledge of typical associate rates.

The Court finds that Ms. Bliss' rate of $ 210 per hour for paralegal work is slightly high for a case such as this, which although moderately document-intensive, did not require particularly in-depth reviews of complex documents such as medical records or detailed financial records.  Rather, this case presented a fairly-straightforward claim for unpaid bills, for which typical paralegal billing rates are appropriate. Based on the Court's experience, such typical rates approach $ 175 per hour, and the Court will limit Ms. Bliss' rate to that amount.

  b.  reasonable hours

The Court then turns to the question of the reasonable hours expended on this matter. Notably, Xtreme's request for fees encompasses only that work performed by the firm of Baker

---

[14]     The Court notes that this range is consistent with the rates requested by Encana's current law firm when it represented the plaintiff in the *Ohio Spine* case, where Mr. Lopach, as lead counsel, sought an hourly rate between $ 370 and $ 425 per hour for himself, and rates between $380 and $ 465 per hour for other partners performing more limited services on the case.  *See* 10-cv-2402, Docket # 74-2.

& Hostetler ("Baker"), who assumed representation of Xtreme after its prior counsel, Mr.

Weaver, withdrew in December 2010.  By that point, the adjudication of dispositive motions had

changed the complexion of this case from a products liability-focused action to a simple breach

of contract action and discovery with regard to Rig 6 had concluded.  Owing to some uncertainty

between the parties about the true scope of the litigation, the Court briefly reopened discovery

for matters relating to Rig 7, but refused to permit further dispositive motions.   Thus, the bulk of

Baker's efforts in this matter were dedicated towards preparing for trial and trying the case.

Xtreme requests an award reflecting a total of 1,749.75 hours billed on this case, split

very roughly evenly among Mr. Quiat, Ms. Kristiansen, and Mr. Curtis, with Mr. Schacht and

Ms. Bliss contributing comparatively fewer hours.  Encana contends that the number of hours

requested is excessive and unreasonable, focusing on two major areas of contention: (i) hours

spent by Mr. Quiat and Mr. Curtis "coming up to speed" on the case after taking over Xtreme's

representation in December 2010; and (ii) all hours incurred by Mr. Kristiansen, who did not

participate at trial.

The Court agrees with Xtreme that the hours it claims for time spent by Baker "coming

up to speed" is compensable.  As Xtreme points out, it has not claimed any compensable

attorney's fees incurred by its prior counsel, Mr. Weaver, even though some of Mr. Weaver's

work – drafting of the pleadings, initial discovery regarding Rig 6, responding to Encana's

summary judgment motion, etc. – would arguably be otherwise compensable to Xtreme.  The

Court cannot say that the relatively limited hours identified by Xtreme as reflecting Baker's

familiarization of itself with the case – approximately 40 hours by Mr. Curtins and 10 hours by

Mr. Quiat – is excessive in light of the fact that such familiarization followed extensive proceedings undertaken by Xtreme's prior counsel, for which no reimbursement is sought.

As to Mr. Kristiansen, the Court disagrees with Encana that **none** of Mr. Kristiansen's time is compensable – among other things, Mr. Kristiansen appeared at a December 9, 2010 Rule 16 Conference and argued Xtreme's motion to amend the Complaint,[15] and his billing entries reflect some work that is appropriately compensable. But the Court also finds that substantial amounts of Mr. Kristiansen's time appear to be excessive or needlessly redundant. Between the December 9, 2010 Rule 16 conference (at which the Court initially set a March 14, 2012 trial date) and the March 1, 2011 Pretrial Conference (at which the Court vacated the trial pending the parties' briefing on whether claims involving Rig 7 will be addressed[16]), Mr. Kristiansen billed 212.65 hours on this case, the equivalent of more than 5 full 40-hour weeks. Nearly all of those billing entries lead off with the generic description "trial preparation," although most entries describe some other tasks as well.[17] Mr. Kristiansen spent more than 50 hours in billing entries

---

[15] The Court denied the motion, which sought to clarify that issues relating to unpaid Rig 7 invoices were also within the scope of Xtreme's claims, at that conference, but ultimately allowed Xtreme to pursue the Rig 7 claims at trial.

[16] Xtreme bears some culpability for the vacatur of the March 2011 trial date. Due to a combination of poor drafting in Xtreme's pleadings and discovery responses and confusing testimony by Mr. Swingle about Xtreme's claims, Encana's belief that invoices regarding Rig 7 were not at issue in the case was somewhat justifiable. The Court does not suggest that Xtreme is **entirely** culpable for the need to vacate the trial and reopen discovery to address Rig 7 as well – Encana bears some of that fault, and indeed, the Court might have been able to address the matter more expediently had it understood the issue more clearly in December 2010 – but the fact remains that Xtreme's own conduct contributed to the need to vacate the March 2011 trial date.

[17] Mr. Kristiansen's billing descriptions tend to use the phrase "attend to issues regarding [various subjects]." This passive construction makes it difficult to ascertain what, exactly, Mr. Kristiansen was actually doing with regard to these issues – *e.g.* whether he was engaged in active tasks like researching or drafting with regard to the issues, more passive tasks like

during this period where the creation of a "timeline" was the primary or a significant focus of his work (12/15/10 – 1/10/11).  At least 12 of Mr. Kristiansen's entries in this time period include time spent in "strategy conferences" (and sometimes, "multiple strategy conferences" in a single day).   During the same time period, Xtreme's billing records also indicate that Mr. Curtis spent an additional 204 hours primarily devoted to trial preparation, and  Mr. Quiat billed more than 106 hours in trial preparation.[18]

The Court finds the total number of hours billed by three partners in preparation for a breach of written contract case – one that was ultimately tried in a mere four days[19] -- is excessive.  Putting aside the over-reliance on partners, rather than lower-cost associates, to prepare many aspects of the case, the sheer amount of time – more than 500 hours – is the equivalent of each partner working **exclusively** on preparing this case for a period of more than a full month (and ignores the fact that, had the Court not continued the trial on March 1, all three partners would likely have continued to prepare at the same rate for the two weeks that remained before the scheduled trial date).   This case was certainly not so complex as to warrant such an expenditure of time.

The Court also finds it appropriate to reduce the amount of compensable hours spent by Mr. Kristiansen because a fair portion of those hours ultimately conveyed no benefit to Xtreme.

---

directing others with regard to the issues, or merely being advised or consulted with regarding the issues.

[18]    By contract, Mr. Schact, the only associate assigned to the case, billed a mere 56.9 hours during this time frame.

[19]    Even this figure is somewhat misleading.  Opening statements, presentation of all evidence, and closing statements occupied less than 3 full days of trial.  Even within those 3 days, considerable portions of  time were consumed by colloquy at the bench about the nature of the parties' claims.

After the Court vacated the March 14, 2011 trial and permitted the parties time to conduct

additional discovery, Mr. Kristansen's involvement in the case rapidly diminished.  From March

2, 2011 onward, Mr. Kristiansen billed a mere 40 hours in this matter, only approximately 6 of

which entailed preparation for the trial that was ultimately held.  (Mr. Kristiansen did not appear

at the trial.)  It is not particularly clear to what extent the time spent by Mr. Kristiansen in

preparing for the aborted 2011 trial produced materials that allowed Mr. Quiat to prepare for the

2012 trial more effectively; the record reflects that Mr. Quiat spent approximately 80 hours in

preparing for the 2012 trial.

Lacking a precise way to measure the portion of Mr. Kristiansen's time was reasonably

incurred by Xtreme, the Court defaults to a simple percentage reduction.  Mr. Quiat's own trial

preparation in 2012 took approximately 75% as much time as he had spent preparing in 2011,

suggesting that his prior preparation might have produced an economy of as much as 25% in

shortened preparation time.  Assuming Mr. Kristiansen's own 212 hours of trial preparation in

2011 yielded a similar benefit to Xtreme in preparing for the 2012 trial, it might be fair to say

that some 53 hours of that time is compensable.  Adding in the 40 additional hours spent by Mr.

Kristiansen after March 1, 2011 yields a total of 93 hours that are appropriately billed to him.

The Court also agrees with Encana's more broad contention that Xtreme's counsel's

billings as a whole are excessive.  Through Mr. Davenport's affidavit, Encana contends that

Xtreme's partner-heavy staffing of the case resulted in attorney's fees greater than would

otherwise be reasonable.  As noted above, the Court agrees that Xtreme's staffing of this case

with three partners[20] and only one associate is unusual and not justified by the complexity of the

case.  Accepting that Mr. Curtis was only an associate in 2010, associate time billed in the case

amounts to 190.2, compared to 1,315.75 hours billed by partners.  Barring some explanation as

to why the peculiarities of the case required such a top-heavy allocation of work, the Court

cannot say that having associates perform less than 15% of the billable work in the case was

reasonable.  The Court finds that an across-the-board reduction of 10% of Mr. Quiat and Mr.

Curtis' billed hours is appropriate to reflect work that could have reasonably been performed by

associates.  (The Court has already reduced Mr. Kristiansen's hours appropriately.)

Accordingly, the Court finds that the lodestar amount is calculated as follows:

- Mr. Quiat: 428 hours claimed, less 10% = 385.2 x $450/hr = $173,340
- Mr. Kristiansen: 93 hours x $448/hr  = $41,664
- Mr. Curtis: 592 hours claimed, less 10% = 532.8 x $350/hr. = $186,480
- Mr. Schact: 100.8 hours claimed x $262/hr. = $26,409.60
- Ms. Bliss: 243.80 hours claimed x $175/hr. = $42,665
**Total**:  $470,558.60

The Court finds this lodestar figure to reflect the reasonable fees incurred in a case such as this

one.  Neither party has argued that this lodestar figure should be adjusted upwards or downwards

to reflect unusual circumstances, and thus, the Court awards a reasonable attorney's fee to

Xtreme in that amount.

2. expenses

Xtreme also seeks an award of $ 35,935.95 in "expenses" (other times identified as

"costs"), allocated to the following categories: electronic research costs, $ 19,614.81; postage

and delivery costs, $ 241.44; telephone charges, $48.70; preparation of documents, $9,223.95;

---

[20]     The Court acknowledges Xtreme's statement that Mr. Curtis was elevated from senior
associate to partner on January 1, 2011, but the Court also recognizes that the bulk of the work
billed in this case occurred after that date.

travel and sustenance, $ 6,807.05.  Subsequent to Xtreme's motion, the Clerk of the Court taxed

costs in favor of Xtreme in the amount of $5,803.16, including $ 2,571.14 in "fees for

exemplification and copies of papers necessarily obtained for use in the case."  Xtreme

acknowledges the taxation of costs in its reply brief and suggests that "any award of costs to

Xtreme under the parties' contract should be reduced by $5,803.16," but does not address the

extent to which the Clerk's taxation of costs overlaps with the requests here.

The Court begins by looking to the parties' contract.  As with attorney's fees, Paragraph

21 merely states that the prevailing party "shall be entitled to recover . . . costs."  Neither party

addresses the interpretation that should be given this term, and in the absence of evidence that

the parties intended the word "costs" to have a non-standard meaning, the Court will assume that

the "costs" the contract makes available are the kinds of costs typically recoverable by a

prevailing party in litigation.  Generally speaking, absent particular statutory authorization,

"costs" are only available to a party pursuant to Fed. R. Civ. P. 54(d)(1), and such costs are

limited to those specified by 28 U.S.C. § 1920.  *Sorbo v. United Parcel Serv.*, 432 F.3d 1169,

1179 (10th Cir. 2005).  Because Xtreme has already recovered those costs available under §

1920, by definition, the remaining costs that it seeks are not recoverable under that statute.

However, there is a body of precedent recognizing that certain expenses that do not fall

within § 1920 – *e.g.* telephone charges, non-taxable copying costs, etc. -- may nevertheless be

awarded (usually as a part of the fee calculation) "if such expenses are usually charged

separately in the area" – that is, as a general practice in the local legal market.  *Sussman v.

Patterson,* 108 F.3d 1206, 1213 (10th Cir. 1997), *citing Ramos v. Lamm*, 713 F.3d 546, 559 (10th

Cir. 1983).  Other than specifically challenging Xtreme's claim for electronic legal research

expenses, Encana has not raised any particular objection to any of the expense items listed by Xtreme.  Mr. Quiat's affidavit  represents that Baker has separately itemized and billed these expense items to Xtreme, and Encana does not contend that this practice is somehow atypical in the local legal market. Accordingly, the Court will not question the remaining expenses, and awards them to Xtreme as part of its fees.

Encana's primary objection to Xtreme's claim for legal research expenses is that Xtreme's invoices "provide[ ] no detail about the nature of the research . . . it is not possible to determine whether the research was necessary for trial preparation or whether the amount spent on such research was reasonable."  In *Case v. Unified School Dist.*, 157 F.3d 1243, 1258 (10th Cir. 1998), the trial court denied recovery of online research costs, finding that "it was not able to separate research related to the appellants' prevailing claims for research on claims which they lost."  The 10th Circuit affirmed, noting that "Trial courts are justified in denying compensation [for online legal research expenses] where the affidavits and time records in the fee submissions fail to differentiate adequately between the costs attributable to billable and non-billable items." *Id.*  That observation is well-taken in this case.  Xtreme's itemization of its computerized legal research expenses is found as Exhibit C to Mr. Quiat's affidavit.  It lists various line items by timekeeper name, amount of cost, and, most significantly, the date such cost was invoiced to Xtreme, rather than the date on which the research was conducted.  Nearly all of the entries on the chart thus correlate to invoice dates of either April 22, 2011 or February 17, 2011, but otherwise offer the Court no insight as to what line items correspond to what subjects Xtreme's counsel was researching, nor permit the Court to correlate such research with particular billing entries.

That defect is significant, as a review of Mr. Curtis and Mr. Schact's billing entries in this time period reveal some research avenues of dubious relevance to the issues that were tried. For example, Mr. Schact's billing entries between December 6, 2010 and January 19, 2011 all mention "legal research regarding assignment of contract and claims," but such issue has no connection to the matters that were tried. (Mr. Curtis' billing entries in this time frame also reference analysis of an assignment issue.) Similarly, his billing entries for March 21 and 22, 2011 reference "legal research regarding day rate contracts as divisible contracts," a matter having no apparent relation to the issues tried here. Mr. Curtis' billing entries are less detailed, but his entry for March 4, 2011 references "research defenses of waiver and estoppel to determine whether a motion in limine would be appropriate," but the Court notes that Xtreme never filed any such motion.

Nevertheless, it is apparent that Xtreme did perform some electronic legal research relevant to the claims at issue here, that it did so to increase the efficiency of its attorney time, and that it separately billed those itemized costs to Xtreme. Encana concedes that in such circumstances, recovery of the reasonable legal research costs incurred is appropriate. *Citing Grynberg v. Ivanhoe Energy, Inc.*, 2011 U.S. Dist. LEXIS 83819 (D.Colo. Aug. 1, 2011). Without the ability to ascertain which individual line items correspond to research on relevant issues, the Court can only resort to the blunt instrument of a percentage reduction to account for legal research conducted on irrelevant issues. Based on its review of Mr. Schact's and Mr. Curtis' billing entries in general, the Court finds it appropriate to reduce Xtreme's claim for legal research expenses by 30% to account for research that may have addressed issues unrelated to

those being tried.  Accordingly, the Court awards Xtreme its legal research expenses in the amount of $ 13,730.36.

All told, then, the Court grants Xtreme's request for expenses in the amount of $30,051.50.  The Court will amend the judgment to reflect the award of $ 500,610.10 to Xtreme for attorney's fees and expenses under Paragraph 21 of the Contract.

3. prejudgment interest

Finally, Xtreme moves **(# 240)** for an award of prejudgment interest on the jury's award. It points to Paragraph 5.2 of the parties' contract, which states: "Any sums (except for amounts ultimately paid with respect to a disputed invoice) not paid within [30 days of receipt] shall bear interest at the rate of 1 percent or the maximum legal rate, whichever is less, per month from the due date until paid."  Encana contends that it timely disputed all of the invoices at issue in this case, and thus, the plain language of the contract does not authorize the imposition of prejudgment interest.

Xtreme's reply offers a clever response: it contends that the exception of disputed invoices from prejudgment interest applies only to invoices that are "ultimately paid."  It argues that, here, "the disputed amounts were merged into the  . . . judgment," such that Encana "can never pay any of the disputed amounts" now; "it can only pay the separate judgment." *Citing Society of Lloyd's v. Reinhart*, 402 F.3d 982, 1004 (10th Cir. 2005).[21]  The Court rejects this argument.  The only items claimed as damages by Xtreme were the amounts of the unpaid invoices, and the jury's verdict in Xtreme's favor thus quantifies the amount of the unpaid

---

[21]  *Lloyds* is clearly inapposite for several reasons, most notably because it (and all of the cases cited by Xtreme in its reply) addresses parties' rights to contractually agree to a post-judgment interest rate other than that specified in 28 U.S.C. § 1961.  402 F.3d at 1004.  None of the cases purport to address pre-judgment interest at all.

invoices that Encana is required to pay.  Xtreme's semantic argument might have merit if the

jury's verdict included sums derived from sources other than the disputed invoices, such that the

judgment blended unpaid invoices and other unquantifiable damages into a single, indivisible

amount, making it impossible to say what portion of the judgment reflected unpaid invoices.  But

that situation is not presented here.  Upon payment of the judgment, Encana will have

"ultimately paid" those (and only those) disputed invoices for which it has been found to be

obligated.[22]  Thus, Xtreme is not entitled to an award of prejudgment interest under the terms of

Paragraph 5.2 of the contract.

## CONCLUSION

For the foregoing reasons, Xtreme's Motion for Attorney's Fees **(# 238)** is **GRANTED**

**IN PART**, insofar as the Judgment **(# 233)** is **DEEMED AMENDED** to include an award of

attorney's fees and expenses in favor of Xtreme in the amount of ,$ 500,610.10, and **DENIED**

**IN PART** in all other respects. Xtreme's Motion to Amend the Judgment **(# 240)** to include

prejudgment interest is **DENIED**.  Encana's Renewed Motion for Judgment as a Matter of Law

or, in the alternative, For a New Trial **(# 242)** is **DENIED**.  Encana's Motion to Strike **(# 257)**

Mr. Stark's affidavit is **DENIED AS MOOT**.

Dated this 22nd day of July, 2013.

**BY THE COURT:**

_Marcia S. Krieger_

_____

---

[22]      Indeed, taken to its logical end, Xtreme's argument suggests that even if Encana pays the
judgment in full, prejudgment interest continues to accrue against it (presumably in perpetuity)
because it still has not paid the invoices themselves.

Marcia S. Krieger
Chief United States District Judge